UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| BERT BAUMAN, Derivatively on Behalf of TITANIUM METALS CORPORATION, | ) ) ) ) | Case No. 3:11-CV-3607 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| HAROLD C. SIMMONS, BOBBY D. O'BRIEN, JAMES W. BROWN, STEVEN L. WATSON, GLENN R. SIMMONS, PAUL J. ZUCCONI, KEITH R. COOGAN, THOMAS P. STAFFORD, TERRY N. WORRELL, and CONTRAN CORPORATION, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | DEMAND FOR JURY TRIAL |
| TITANIUM METALS CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

## NATURE AND SUMMARY OF THE ACTION

1.     This is a verified shareholder derivative action brought on behalf of nominal defendant Titanium Metals Corporation ("TIMET" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.

2.     Plaintiff brings this action to address a long-standing pattern and practice of self-dealing by TIMET's Chairman and controlling shareholder, defendant Harold C. Simmons ("H. Simmons").  This systematic abuse of power was either explicitly or tacitly condoned by TIMET's Board of Directors (the "Board"), which H. Simmons dominates.  H. Simmons and the Board he controls have caused TIMET to engage in a number of dealings with sister entities controlled by H. Simmons on terms beneficial to H. Simmons's entities but detrimental to TIMET.  These transactions include below-market-rate loans made by TIMET to companies controlled by H. Simmons, complex insurance arrangements and the provision of other services in which TIMET and several related parties participate and jointly share costs, and TIMET's purchases of the stock of an H. Simmons-controlled company at inflated values.

3.     The defendants were able to perpetuate this systematic regime of self-dealing by filing materially misleading proxy statements with the U.S. Securities and Exchange Commission (the "SEC") that omitted the true nature of these related-party transactions.  The Board benefitted from these materially misleading proxies, as it protected them from shareholder scrutiny, allowing them to get re-elected, and continue to receive the benefits of serving on defendant H. Simmons-controlled companies.

4.     Because defendant H. Simmons stands on both sides of these transactions, he and the other members of the Board have a fiduciary obligation to the Company and its minority shareholders to ensure that such related-party transactions are entirely fair to the Company.  As

discussed in more detail below, the Individual Defendants (as defined herein) breached those duties because the transactions entered into only benefitted one person, H. Simmons, at the expense of the entire company they were supposed to protect.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. section 1331 because of claims arising under sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

6.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this Court in accordance with 28 U.S.C. section 1391(a) because: (i) TIMET maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to TIMET, occurred in this District; and (iv) defendants have

received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

8.     Plaintiff Bert Bauman was a shareholder of TIMET at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current TIMET shareholder.

**Nominal Defendant**

9.     Nominal Defendant TIMET is a Delaware corporation and the world's largest supplier of titanium metal products.  TIMET is a fully-integrated titanium manufacturer and distributor with activities that span every phase of titanium research, manufacturing, and sales. TIMET's principal executive offices are located at 5430 LBJ Freeway, Suite 1700, Dallas, Texas. TIMET is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

10.     Defendant H. Simmons is TIMET's Chairman of the Board and has been since November 2005 and a director and has been since 2004.  H. Simmons was also TIMET's Chief Executive Officer ("CEO") from November 2005 to January 2006 and Vice Chairman of the Board from August 2004 to 2005.  Importantly, H. Simmons is the majority shareholder of TIMET, controlling approximately 52% of outstanding TIMET stock, either directly or through trusts and related corporations which he controls.  H. Simmons is the brother of fellow Board member and defendant Glenn R. Simmons ("G. Simmons").

(a)     As portrayed in the diagram in sub-paragraph (b) below, in addition to TIMET and defendant Contran Corporation ("Contran"), defendant H. Simmons controls several

other companies, including Kronos Worldwide, Inc. ("Kronos"), Valhi, Inc. ("Valhi"), CompX International Inc. ("CompX"), and NL Industries, Inc. ("NL").   H. Simmons controls a significantly higher percentage of the shares of some of these other companies than he controls of TIMET.   For example, he controls approximately 95% of Valhi; approximately 86% of NL; and approximately 89% of CompX.

(b)   Valhi owns approximately 50% of the outstanding common stock of Kronos, and NL owns approximately 30% of Kronos's outstanding stock.   In addition, Valhi owns approximately 83% of NL's outstanding common stock.   NL owns 87% of CompX stock. Therefore, by virtue of defendant H. Simmons's control over Valhi, he is the controlling shareholder of Kronos, NL, and CompX as well.   This structural organization, full of potential conflicts of interests, providing H. Simmons the opportunity to further his systematic abuse of power and widespread self-dealing, is visually depicted below:



(c)     Defendant H. Simmons knowingly or recklessly: (i) caused or allowed the

Company to engage in a number of self-dealing transactions that were beneficial to sister entities

he controlled at the expense of the Company; and (ii) concealed the true nature of these

transactions by disseminating materially inaccurate proxy statements perpetuating his rampant abuse of power.  TIMET paid H. Simmons the following compensation as an executive:

| Year | Salary | Stock Awards | Total |
|------|--------|--------------|-------|
| 2010 | $1,023,000 | $15,000 | $1,038,000 |
| 2009 | $1,024,000 | $12,195 | $1,036,195 |
| 2008 | $1,023,000 | $16,120 | $1,039,120 |
| 2007 | $1,024,000 | $17,160 | $1,041,160 |

11.     Defendant Bobby D. O'Brien ("O'Brien") is TIMET's CEO and has been since December 2009 and President and has been since 2007.  O'Brien was also TIMET's Executive Vice President and Chief Financial Officer ("CFO") from 2006 to 2007 and Vice President from 2004 to 2006.  Since at least 2006, O'Brien has served as CFO and Vice President of Valhi and defendant Contran.  O'Brien was also Treasurer of Valhi and Contran until 2006.  O'Brien has served in financial and accounting positions with various companies related to TIMET and Contran since 1988.  O'Brien knowingly, recklessly, or with gross negligence caused or allowed the Company to engage in a number of self-dealing transactions that were beneficial to sister entities defendant H. Simmons controlled at the expense of the Company.  TIMET paid O'Brien the following compensation as an executive:

| Year | Salary | Total |
|------|--------|-------|
| 2010 | $923,800 | $923,800 |
| 2009 | $821,100 | $821,100 |
| 2008 | $997,100 | $997,100 |
| 2007 | $829,300 | $829,300 |

12.     Defendant James W. Brown ("Brown") is TIMET's Vice President and CFO and has been since 2007.  Brown was also TIMET's Vice President, Corporate Finance from 2006 to 2007.  Brown was Vice President and Controller of NL and Kronos from 2003 to 2006.  Brown knowingly, recklessly, or with gross negligence caused or allowed the Company to engage in a number of self-dealing transactions that were beneficial to sister entities defendant H. Simmons

controlled at the expense of the Company.  TIMET paid Brown the following compensation as an executive:

| Year | Salary | Total |
|------|--------|-------|
| 2010 | $607,100 | $607,100 |
| 2009 | $695,000 | $695,000 |
| 2008 | $473,500 | $473,500 |
| 2007 | $586,700 | $586,700 |

13.     Defendant Steven L. Watson ("Watson") is TIMET's Vice Chairman of the Board and has been since November 2005 and a director and has been since 2000.   Watson was also TIMET's CEO from 2006 to December 2009 and President in 2006.  Watson is Kronos's CEO and has been since February 2009.  Since at least 2006, Watson has also served as Valhi's CEO, President, and director; defendant Contran's President and director; and Kronos's Vice Chairman of the Board.  Watson has served as an executive officer or director of various companies related to Contran and Valhi since 1980.  Watson knowingly, recklessly, or with gross negligence: (i) approved a number of self-dealing transactions that were beneficial to sister entities defendant H. Simmons controlled at the expense of the Company; and (ii) concealed the true nature of these transactions by disseminating materially inaccurate proxy statements perpetuating this rampant abuse of power.  TIMET paid Watson the following compensation as an executive:

| Year | Salary | Stock Awards | Total |
|------|--------|--------------|-------|
| 2010 | $901,600 | $15,000 | $916,600 |
| 2009 | $941,600 | $12,195 | $953,795 |
| 2008 | $1,021,700 | $16,120 | $1,037,820 |
| 2007 | $1,025,300 | $17,160 | $1,042,460 |

14.     Defendant  G.  Simmons  is  a  TIMET  director  and  has  been  since  1999.   G. Simmons is also Vice Chairman of the Board of Valhi and defendant Contran and has been since 1987.  Since at least 2006, G. Simmons has served as CompX's Chairman; Keystone's Chairman; a Kronos director; and an NL director.  G. Simmons has also served as an executive officer or

director of various companies related to defendant Contran and Valhi since 1969.  G. Simmons is the brother of defendant H. Simmons.  G. Simmons knowingly or recklessly: (i) approved a number of self-dealing transactions that were beneficial to sister entities defendant H. Simmons controlled at the expense of the Company; and (ii) concealed the true nature of these transactions by disseminating materially inaccurate proxy statements perpetuating this rampant abuse of power.  TIMET paid G. Simmons the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $23,000 | $15,000 | $38,000 |
| 2009 | $25,000 | $12,195 | $37,195 |
| 2008 | $24,000 | $16,120 | $40,120 |
| 2007 | $26,000 | $17,160 | $43,160 |

15.    Defendant Paul J. Zucconi ("Zucconi") is a TIMET director and has been since 2002.  Zucconi was also a member of TIMET's Audit Committee from at least April 2007 to at least April 2011.  Zucconi knowingly or recklessly: (i) approved a number of self-dealing transactions that were beneficial to sister entities defendant H. Simmons controlled at the expense of the Company; and (ii) concealed the true nature of these transactions by disseminating materially inaccurate proxy statements perpetuating this rampant abuse of power. TIMET paid Zucconi the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $47,000 | $15,000 | $62,000 |
| 2009 | $49,000 | $12,195 | $61,195 |
| 2008 | $48,000 | $16,120 | $64,120 |
| 2007 | $51,000 | $17,160 | $68,160 |

16.    Defendant Keith R. Coogan ("Coogan") is a TIMET director and has been since 2006.  Coogan is also a Kronos Worldwide director and has been since at least 2006.  Coogan was a CompX director from 2002 to 2006 and a Keystone Consolidated Industries, Inc. ("Keystone") director from 2003 to 2005.  Coogan was a member of TIMET's Audit Committee

and Management Development and Compensation Committee ("Compensation Committee") from at least April 2007 to at least April 2011. Coogan knowingly or recklessly: (i) approved a number of self-dealing transactions that were beneficial to sister entities defendant H. Simmons controlled at the expense of the Company; and (ii) concealed the true nature of these transactions by disseminating materially inaccurate proxy statements perpetuating this rampant abuse of power. TIMET paid Coogan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $39,000 | $15,000 | $54,000 |
| 2009 | $41,000 | $12,195 | $53,195 |
| 2008 | $41,000 | $16,120 | $57,120 |
| 2007 | $43,000 | $17,160 | $60,160 |

17.    Defendant Thomas P. Stafford ("Stafford") is a TIMET director and has been since 2006. Stafford was also a TIMET director from 1996 to 2003. Stafford was Chairman of TIMET's Audit Committee and Compensation Committee from at least April 2007 to at least April 2011. Stafford knowingly or recklessly: (i) approved a number of self-dealing transactions that were beneficial to sister entities defendant H. Simmons controlled at the expense of the Company; and (ii) concealed the true nature of these transactions by disseminating materially inaccurate proxy statements perpetuating this rampant abuse of power. TIMET paid Stafford the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $51,000 | $15,000 | $66,000 |
| 2009 | $53,000 | $12,195 | $65,195 |
| 2008 | $52,000 | $16,120 | $68,120 |
| 2007 | $55,000 | $17,160 | $72,160 |

18.    Defendant Terry N. Worrell ("Worrell") is a TIMET director and has been since 2007. Worrell was also a TIMET director in 2003. Worrell is an NL director and has been since at least 2006. Worrell was also a member of TIMET's Audit Committee from June 2007 to at

least April 2011 and a member of the Compensation Committee from at least April 2009 to at least April 2011.   Worrell knowingly or recklessly: (i) approved a number of self-dealing transactions that were beneficial to sister entities defendant H. Simmons controlled at the expense of the Company; and (ii) concealed the true nature of these transactions by disseminating materially inaccurate proxy statements perpetuating this rampant abuse of power. TIMET paid Worrell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $41,000 | $15,000 | $56,000 |
| 2009 | $42,000 | $12,195 | $54,195 |
| 2008 | $39,000 | $16,120 | $55,120 |
| 2007 | $21,000 | $16,370 | $37,370 |

19.     Defendant Contran is the parent corporation of the consolidated tax group that includes Valhi, CompX, and NL.  All of Contran's outstanding voting stock is held by defendant H. Simmons, persons or entities related to H. Simmons, and trusts established for H. Simmons's children and grandchildren, of which H. Simmons is the sole trustee.  Contran owns 100% of the shares of Dixie Rice Agricultural Corporation, Inc. ("Dixie Rice"), which in turn, owns 100% of the shares of Valhi Holdings Company ("VHC").

20.     The defendants identified in ¶¶10-13 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶10, 13-18 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶15-18 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶10-18 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

21.     By reason of their positions as officers, directors, and/or fiduciaries of TIMET and because of their ability to control the business and corporate affairs of TIMET, the Individual Defendants owed and owe TIMET and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage TIMET in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of TIMET and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

22.     By reason of his position as controlling shareholder, defendant H. Simmons is a fiduciary of the Company and its shareholders.  As such, H. Simmons owed and owes the Company and its shareholders the highest duties of loyalty, candor, and good faith and fair dealing.

23.     Each officer and director of the Company owes to TIMET and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts.

**Control, Access, and Authority**

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of TIMET, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

25.     Because of their advisory, executive, managerial, and directorial positions with TIMET, each of the Individual Defendants had access to adverse, non-public information about the improper related-party transactions involving TIMET.  While in possession of this material, non-public information, the Individual Defendants made improper representations concerning the Company, including information regarding the fairness of TIMET's related-party transactions and apparent conflicts of interests.

26.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of TIMET, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

27.     To discharge their duties, the officers and directors of TIMET were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of TIMET were required to, among other things:

(a)     properly and accurately police related-party transactions from going forward on terms unfavorable to the Company and its shareholders;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to its investors;

(c)     refrain from acting upon material, inside corporate information to benefit themselves;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)     remain informed as to how TIMET conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

28.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of TIMET, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of TIMET's Board.

29.     The Individual Defendants breached their duty of loyalty and good faith by failing to fairly evaluate the related-party transactions described herein, by permitting such transactions to go forward on terms unfavorable to the Company and its shareholders, by failing to put in place sufficient internal controls to stop such related-party transactions from going forward on terms unfavorable to the Company and its shareholders, and by elevating the interests of defendant H. Simmons and his affiliated entities over the interests of TIMET.  The Individual

Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, TIMET has expended, and will continue to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

30.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

31.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of TIMET, regarding the Individual Defendants' management of TIMET's operations and unfair related-party transactions; (ii) facilitate the interests of defendant H. Simmons and his affiliated entities over the interests of TIMET; and (iii) enhance the Individual Defendants' executive and directorial positions at TIMET and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

32.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue materially false and misleading statements to shareholders that were contained in the Company's proxy materials.

33.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual

Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations and unfair related-party transactions.

34. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release materially false and misleading statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

35. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## TIMET'S TOOTHLESS INTERNAL POLICIES

36. TIMET has a stated related party transaction policy that requires transactions with affiliates and related parties to be on terms that are "no less favorable to us than could be obtained from unrelated parties...." According to TIMET's proxy statements, alternatively, if the transaction is not ratified by the stockholders or approved by the Company's independent directors, it must be "fair to all companies involved."

37. TIMET's related party transaction policy explains that "directors and officers owe a duty to [the Company] to advance [the Company's] legitimate interests when the opportunity to do so arises; and they are prohibited from (a) taking for themselves personally opportunities that properly belong to [the Company] or are discovered through the use of [the Company's]

property, information or position, (b) using corporate property, information or position for improper personal gain and (c) competing with [the Company's] interests."

38.    The Board failed, however, to take any action to enforce this vague and general framework.  The Board admits that there really are "[n]o specific procedures … in place … that govern the treatment of transactions among [the Company] and [its] related entities."  As such, the Board is aware of its systematic failure to implement adequate internal controls to police related-party transactions.  Moreover, the Board delegates responsibility for applying this already nebulous policy to the Company's own executive officers, the very conflicted insiders, instead of requiring ratification by the independent directors.  The Company's proxy statement filed with the SEC on Form DEF 14A on April 5, 2011 (the "2011 Proxy Statement"), describes the related party transaction policy as follows:

> [n]o specific procedures are in place, however, that govern the treatment of transactions among us and our related entities, although we and such entities may implement specific procedures as appropriate for particular transactions. Provided, in our judgment, the standard set forth in the code of business conduct and ethics is satisfied, we believe, given the number of companies affiliated with Contran, that related party transactions with our affiliates, in many instances (such as achieving economies of scale), are in our best interest. In certain instances, our executive officers may seek the approval or ratification of such transactions by our independent directors, but there is no quantified threshold for seeking this approval.

39.    Over the past several years, defendant H. Simmons has caused TIMET to violate even this lax and toothless, related party transaction policy.  H. Simmons has caused TIMET to engage in a number of self-interested transactions with affiliated companies in which he has varying levels of ownership and control. These transactions have not been on terms that are either fair to TIMET or on terms that could be achieved with unrelated third parties.  The transactions include several loans TIMET has made to other H. Simmons-controlled entities at below-market interest rates and agreements with H. Simmons-controlled companies regarding

utility services, data recovery, and insurance that are unfavorable to the Company.   Most recently, H. Simmons caused TIMET to purchase shares of one of his controlled entities for a far greater amount than the intrinsic value of the stock, artificially propping up the value of the stock (of a company which H. Simmons and his family own 94%).   These transactions are structured to provide maximum benefit to H. Simmons at the expense of TIMET and its minority shareholders.

40.      Defendant H. Simmons is able to structure these transactions to favor his other companies because there is substantial overlap between the officers and directors of the Company and the officers and directors of the affiliated entities. Indeed, as described above, certain directors or executive officers of defendant Contran, CompX, Kronos, NL, and Valhi also serve as directors or executive officers of the Company. For example, defendant G. Simmons, the brother of H. Simmons, has been a member of TIMET's Board since 1999 and since prior to 2006, has also been Vice Chairman of the Board of Contran and Chairman of the Board of CompX.   G. Simmons also was a member of the Boards of Kronos and NL.   Similarly, defendants Stafford and Worrell are directors of both TIMET and NL, and defendant Coogan is a director of both TIMET and Kronos.   Although the 2011 Proxy Statement admits that "[s]uch relationships may lead to possible conflicts of interest," it misleadingly states that "[TIMET] implement[s] such procedures as appropriate for the particular transaction" in order to negate these conflicts.   The dangerous overlap between the officers and directors of TIMET and the affiliated entities is portrayed below:



## IMPROPER RELATED-PARTY TRANSACTIONS

41.     TIMET is one of a number of corporations controlled by defendant H. Simmons and related entities.  The Company's 2011 Proxy Statement reflects that over at least the past three years, TIMET has engaged in extensive related-party transactions with these other H. Simmons-controlled entities.

42.     The following is an analysis of seven related-party transactions that involve self-dealing violations of the Board's duty of loyalty to TIMET shareholders including: (i) a below-market rate loan made by the Company to defendant Contran; (ii) a separate, below-market rate credit facility made by the Company to Contran that was never approved by the Company's "independent" directors; (iii) a below-market rate loan made by the Company to CompX; (iv) a "group" risk management program in which the Company and several related-parties participated in that was never approved by the Company's "independent" directors; (v) the Company's purchases of utility services from a related-party that were never approved by the Company's "independent" directors; (vi) the Company's participation in an information technology program run by Contran that was never approved by the Company's "independent" directors; and (vii) the purchase of Valhi stock.

### The Below-Market-Rate Loan to Defendant Contran

43.     In December 2008, the Company sold to defendant Contran certain stock it owned in an unaffiliated third-party company.  The purchase price was $16.7 million payable by Contran to the Company in the form of a loan that matures on December 31, 2011.  This loan facility bears interest at the prime rate less 1.50% and is collateralized by the stock Contran purchased in the transaction.  It requires quarterly payments of interest only.

44.     The average rate charged on secured loans of $10 million to $30 million originated in the United States between November 1, 2008 and January 31, 2009 was LIBOR[1] plus 4.86%.  The three-month LIBOR rate at this time ranged from 1.2108% to 2.2791%.  Thus, the average rate for such loans ranged from 6.0708% to 7.1391%, compared to the 1.75% TIMET charged defendant Contran at the inception of this loan.

45.     Further evidence of the unfairness of the sale/loan transaction is the fact that defendant Contran made no principal payments on the loan in either 2009 or 2010.

46.     Basically, defendant Contran used TIMET's own money to purchase an asset from the Company at a below market rate.  There is no justification for accepting a below-prime-rate loan in exchange for the sale of shares to a related party.  Moreover, there is no indication that the Board considered alternatives to sales to a related party.

**The Below-Market-Rate Loan Facility to Contran**

47.     During 2009, the Company granted defendant Contran a separate unsecured related-party loan, maturing on March 31, 2012.  The first $15 million borrowed pursuant to this loan facility bears interest at the prime rate less 1.50% and prime rate for amounts borrowed above $15 million.  The terms of the loan require only that Contran make quarterly payments of interest. During 2010, the principal balance on this loan reached as high as $84.4 million.

48.     TIMET admits that its independent directors were never asked to approve the loan. The 2011 Proxy Statement states: "Since we made this loan pursuant to our cash

---

[1] The LIBOR rate is an acronym for London Interbank Offered Rate and is the average interest rate that leading banks in London charge when lending to other banks.  Banks borrow money for one day, one month, two months, six months, one year, etc., and they pay interest to their lenders based on certain rates.  The LIBOR figure is an average of these rates.  Many financial institutions, mortgage lenders, and credit card agencies track the rate, which is produced daily at 11 a.m., to fix their own interest rates which are typically higher than the LIBOR rate.  As such, it is a benchmark for finance all around the world.

management program, our independent directors received a report on this loan but we did not ask them to approve the loan."  Likewise, the full Board did not approve the loan.

49.     The terms of this loan are less favorable to TIMET than terms that a loan of a similar nature and risk would command.  For example, for unsecured revolver/364 day loans of between $50 million and $100 million made in the United States between February 1, 2009 and April 30, 2009, the average rate was LIBOR plus 2.45%.  The three-month LIBOR rate at this time ranged from 1.1062% to 1.2426%.  Thus, loans of this nature were being made at 3.5562% to 3.6926% compared to the 1.75% (prime of 3.25% minus 1.5%) to 3.25% (prime) TIMET charged defendant Contran at the inception of this loan.

50.     Defendant H. Simmons stands on both sides of this transaction, and because the terms of the transaction are not entirely fair to the Company (as to both price and process), it violates the Company's related party transaction policy.

**The Below-Market-Rate Loan to CompX**

51.     In October 2007, CompX purchased and/or canceled 2.7 million CompX shares owned by TIMET. In exchange, TIMET was given an unsecured promissory note for $52,580,190, bearing an annual interest of LIBOR plus 1.00% and requiring quarterly principal payments of $250,000.  This interest rate was below the prime rate at the time the loan was initially made in October 2007, and has been below the prime rate for almost the entire life of the loan.  For example, as of September 2011, this loan was accruing interest at the rate of 1.34% (1% above the then current three-month LIBOR rate of 0.34%) while the prime rate is 3.25% - more than double the interest rate that CompX is paying TIMET.  If the terms of the initial loan were not egregious enough, they were made even more disadvantageous to TIMET in September 2009.  At that time, the terms of the loan were amended to defer principal and interest payments on the loan until March 31, 2011.

52.     The terms of the CompX loan do not satisfy the Company's policy for loans to related entities and are therefore unfair to TIMET.  In a tight credit market such as the one this country has been experiencing for the last several years, there is no explanation other than self-dealing for a loan to be made on terms so favorable to CompX.

53.     While the independent directors approved the October 2007 stock purchase agreement and loan terms, the Board did not consider the September 2009 amendment to the agreement and what benefits, if any, TIMET would receive in exchange for not receiving interest and principal payments for approximately eighteen months.

**The Combined Risk Management Program**

54.     TIMET, defendant Contran, and certain of Contran's subsidiaries and related entities purchase insurance policies and risk management services as a group, the costs of which are supposed to be apportioned among the participating companies.  The insurance and risk management services, however, are purchased from two insurance companies wholly owned by Valhi and NL (i.e., Tall Pines Insurance Company ("Tall Pines") and EWI RE, Inc. ("EWI"), respectively).  In 2010 alone, the Company paid Tall Pines and EWI $6.3 million.  In 2009 and 2008, respectively, the Company paid $7.1 million and $7.8 million for those programs.

55.     The independent directors of the Company did not approve the Company's participation in a combined risk management program with these related parties (nor do the Company's independent directors appear to have approved the use of insurance companies that are wholly-owned by such related parties to execute the combined program).

56.     Not only does defendant H. Simmons stand on both sides of this transaction, each of the remaining TIMET directors, other than defendant Zucconi, also serve as directors in other companies that are parties to this arrangement.

57.     The Board also failed to employ appropriate internal controls to assure: (i) the fairness of the risk management services to TIMET; (ii) the fairness of the allocations to TIMET; and (iii) that problems in the risk management services would be brought to the Board's attention.

**Utility Services**

58.     The Company purchased certain utility services from Basic Management, Inc. ("BMI"), a company in which a wholly-owned Valhi subsidiary owns a 29% voting interest.  In 2010, the Company paid approximately $1.4 million for those services. In 2009 and 2008, respectively, it paid $2.2 million and $2.3 million.

59.     Defendant H. Simmons stands on both sides of these transactions, being the Chairman of the Board and controlling shareholder of both TIMET and Valhi.  He owns a substantially greater percentage of the shares of Valhi than he does of TIMET; accordingly, the rewards of the arrangement accrue primarily to H. Simmons and his family, while the excessive costs are borne by TIMET's minority shareholders.

60.     Moreover, despite the fact that defendant H. Simmons stands on both sides of these transactions, the Board admits that it failed to have its "independent" directors approve this arrangement.  As such, this arrangement is lacking entire fairness, especially in terms of the process leading to the transactions.  The Board breached its fiduciary duties by failing to have internal controls in place to fairly assess and approve such related-party transactions.

**Data Recovery Program**

61.     The Company participates in a combined information technology data recovery program run by defendant Contran.  For 2010, the Company paid $136,000 to Contran for this service.  Like the utility services arrangement, this program was not approved by the Company's independent directors.

62.     Unlike with the utility services arrangement, the 2011 Proxy Statement, in its discussion of this program, does not even include a statement that the Company believes that the allocation of costs among the related parties in this program is reasonable or that the cost is less than if these services were separately purchased by TIMET.

63.     Defendant H. Simmons stands on both sides of this transaction, being the Chairman of the Board and controlling shareholder of both TIMET and defendant Contran.  He owns a substantially greater percentage of the shares of Contran than he does of TIMET; accordingly, the rewards of an allocation of data recovery costs more favorable to Contran than to TIMET benefit H. Simmons and his family, while the excessive costs are borne by TIMET's minority shareholders.  The terms of this arrangement are less favorable to TIMET than terms that TIMET could command in an arm's-length deal between unrelated parties.  As such, this transaction was not entirely fair to the Company in terms of price.  Moreover, despite the fact that H. Simmons stands on all sides of this transaction, and each of the remaining TIMET directors, other than defendant Zucconi, also serve as directors in other companies that are parties to this arrangement, the Board admits that it failed to have its "independent" directors approve this arrangement.  As such, this transaction is lacking entire fairness, not only in terms of price, but also in terms of the process used to approve the transaction.

64.     The Board failed to take action to assure the fairness of this program and its costs to TIMET. The Board breached its fiduciary duty to oversee the implementation of the data recovery services in a manner that was fair to TIMET.

**TIMET's Purchases of Valhi Stock**

65.     Defendant H. Simmons engaged in self-dealing relating to TIMET's purchases of shares of Valhi (a company he and/or his family members own approximately 94% of through direct ownership or as beneficiaries of trusts) without the approval of the Board.

66.     Between June 2011 and November 2011, a wholly-owned subsidiary of TIMET purchased over 679,000 shares of Valhi stock, at a cost of over $34 million - an average of more than $51 per share.  These purchases have helped defendant H. Simmons by artificially inflating the value of shares of Valhi stock.

67.     Because the public owns less than 6% of the outstanding shares of Valhi, TIMET's sizable stock purchases had a disproportionate impact on the price of Valhi shares.  In that single transaction, TIMET purchased more than 5% of the minority shares of Valhi. The significance of TIMET's purchases is reflected in the fact that since June 16, 2011 (when TIMET began to purchase Valhi shares), the volume of Valhi shares traded has increased from an average of about 30,000 shares per day in the prior three and-a half months to an average of approximately 37,000 shares per day since, a 23% increase.

68.     Defendant H. Simmons stands on both sides of this transaction, being the Chairman of the Board and controlling shareholder of both TIMET and Valhi.  He owns a substantially greater percentage of the shares of Valhi than he does of TIMET; accordingly, the rewards of these purchases benefit primarily H. Simmons and his family, while the excessive costs are borne by TIMET's minority shareholders.  Moreover, despite the fact that H. Simmons stands on both sides of this transaction, the independent directors did not approve this transaction.  As such, this transaction is lacking entire fairness, including in terms of the process used to approve the transaction.

69.     This is not defendant H. Simmons's first time abusing his power as a fiduciary to benefit himself.  Just six months ago, on June 26, 2011, Seekingalpha.com, a stock market opinion and analysis blog, posted an article that claimed that H. Simmons was engaging in transactions to enrich himself at the expense of Kronos's minority shareholders by causing

Kronos to purchase shares of Valhi at substantially inflated prices.  While the article was focused on Kronos's purchases, H. Simmons has been causing TIMET to make similar purchases of Valhi stock, harming its public shareholders in the same way that Kronos's shareholders are harmed by Kronos's purchases of Valhi stock.

70.      The Board failed to take action to assure that these Valhi stock purchases had a valid business purpose for TIMET and that they occurred at prices fair to TIMET.  The Board breached its fiduciary duty to oversee these stock purchases in a manner that was fair to TIMET.

71.      Each of these self-dealing transactions benefited defendant H. Simmons at the expense of TIMET and the Company's minority shareholders.  Substantively, each transaction occurred on terms that were not entirely fair to TIMET.  Moreover, the Board's failure to adequately disclose the nature and extent of these and other related-party transactions, or the steps it has taken to ensure that these related transactions are made on terms that are at least as favorable to the Company as could be obtained in arm's-length transactions, provides further evidence of the transactions' unfairness to TIMET.  It also demonstrates that the Board has consistently breached its fiduciary duties in approving certain of the transactions and in knowingly failing to take steps to prevent, correct, or rescind the unfair transactions it did not directly approve.

## THE MATERIALLY MISLEADING PROXY STATEMENTS

72.      The Individual Defendants caused TIMET to file annual proxy statements with the SEC on Form DEF 14A on or about April 9, 2009 (the "2009 Proxy Statement"), April 7, 2010 (the "2010 Proxy Statement"), and April 5, 2011 (the 2011 Proxy Statement) (collectively, the "Proxy Statements").  Each of the Proxy Statements was signed "By Order of the Board of Directors."  Each of the Director Defendants, H. Simmons, Watson, Zucconi, Coogan, Stafford,

Worrell, and G. Simmons, served on the Board for all three of these misleading Proxy Statements and are responsible for their materially misleading statements.

73.     Each of the Proxy Statements was materially inaccurate because they failed to disclose numerous highly material facts and circumstances.  The materially inaccurate Proxy Statements caused direct harm to the Company in that, among other things, defendants' omissions perpetuated a systematic regime of self-dealing, causing TIMET to engage in a number of transactions with sister entities controlled by defendant H. Simmons on terms highly beneficial to the H. Simmons entities and highly detrimental to TIMET.

74.     Each of the Proxy Statements was intended to, and did, procure TIMET's shareholders' votes with respect to matters materially affecting the Company that legally required shareholder approval.  All three Proxy Statements sought and obtained reelection of the Director Defendants by shareholder vote, in each case upon the Board's explicit recommendation as to which directors should be reelected.

75.     Each of the Director Defendants was duty bound, pursuant to his general fiduciary duties under Delaware law and by the provisions of federal securities laws, to fully disclose all information material to the shareholders' decision concerning how to cast their votes in connection with the election of Board members in 2009, 2010, and 2011.

76.     Despite the Director Defendants' fiduciary duties and in violation of state and federal law, the Board caused TIMET to file and disseminate the materially inaccurate Proxy Statements. Specifically, in TIMET's Proxy Statements, Director Defendants, H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons, provided materially misleading information and disclosures concerning the Company, the general responsibilities of the Board and its committees, and the basis upon which the members of the Board were seeking election to

another term of office.  In the Proxy Statements, Director Defendants, H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons, uniformly failed to disclose material information to shareholders concerning critical aspects of the Board's responsibilities and activities, including its obligation to ensure compliance with the Company's Code of Business Conduct and Ethics and applicable fiduciary duties to avoid related-party transactions that involve self-dealing and are detrimental to the Company.

77.    The Proxy Statements provide only a bare-bones description of these numerous, varied related-party transactions without providing the level of detail necessary to determine the nature and extent of the fairness behind these transactions.  The Proxy Statements were materially inaccurate and incomplete because, among other things, Director Defendants, H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons, failed to disclose the extent of the unfair benefit to H. Simmons and subsequent detriment to TIMET relating to the:

(a)    below-market rate loan made by the Company to defendant Contran;

(b)    separate, below-market rate credit facility made by the Company to Contran that was never approved by the Company's "independent" directors;

(c)    below-market rate loan to CompX;

(d)    "group" risk management program in which the Company and several related-parties participated in that was never approved by the Company's "independent" directors;

(e)    Company's purchases of utility services from a related-party that were never approved by the Company's "independent" directors; and

(f)    Company's participation in an information technology program run by Contran that was never approved by the Company's "independent" directors.

78.     In light of the Director Defendants' highly material omissions from the Proxy Statements, the votes and the resulting election of directors to the Board were obtained on the basis of inaccurate disclosures.  Had shareholders been provided with complete and accurate information concerning the Board's performance of its duties including with respect to presiding over defendant H. Simmons's extensive self-dealing - the members of the Board would not have been re-elected.

79.     The re-election of the Director Defendants inflicted significant harm on the Company.  In the absence of the Board's fulfillment of its obligations, the Company was left helpless to prevent the misconduct occurring in its name.  But for the Board's refusal to carry out its duties, the harm that befell the Company would not have occurred.

80.     Accordingly, TIMET has been damaged by the materially inaccurate statements and omissions in the Proxy Statements that procured the re-election of the Director Defendants to the Board and allowed them to perpetuate their misconduct.

## DAMAGES TO TIMET

81.     As a result of the Individual Defendants' improprieties, TIMET was forced to engage in a number of transactions with sister entities controlled by defendant H. Simmons on terms highly beneficial to H. Simmons's entities and highly detrimental to TIMET.  Moreover, the Company was used as a pawn to perpetuate this systematic abuse of power and lopsided self-dealing by disseminating the materially inaccurate Proxy Statements and thus violating the federal securities laws.

82.     Further, as a direct and proximate result of the Individual Defendants' actions, TIMET has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to the:

(a)    costs incurred and profits lost from the below market rate loan to defendant Contran;

(b)    costs incurred and profits lost from the below market rate loan facility to Contran;

(c)    costs incurred and profits lost from the below market rate loan to CompX;

(d)    costs incurred  from the utility services purchased from BMI;

(e)    costs incurred  from the data recovery services purchased from Contran on unfavorable terms;

(f)    unfavorable allocation of the costs relating to insurance and risk management services purchased from Tall Pines and EWI;

(g)    costs incurred  from the purchase of Valhi shares; and

(h)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to TIMET.

83.    Moreover, these actions have irreparably damaged TIMET's corporate image and goodwill.  For at least the foreseeable future, TIMET will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that TIMET's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84.    Plaintiff brings this action derivatively in the right and for the benefit of TIMET to redress injuries suffered, and to be suffered, by TIMET as a direct result of violations of the securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  TIMET is named as a

nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

85.     Plaintiff will adequately and fairly represent the interests of TIMET in enforcing and prosecuting its rights.

86.     Plaintiff was a shareholder of TIMET at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current TIMET shareholder.

87.     The current Board of TIMET consists of the following seven directors: defendants H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

88.     The directors' fiduciary duty requires the exercise of utmost good faith, fair dealing, disclosure, and avoiding even the impropriety of self-interest or self-dealing.  Defendant H. Simmons stands on both sides of each of the transactions at issue in this action as the controlling shareholder of TIMET and each of the related parties that are involved in the transactions.  As a result, each of the transactions at issue in this Complaint is subject to entire fairness review.  Because entire fairness is the standard of review, the business judgment rule and the demand requirement are inapplicable.

89.     Further, as the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread self-dealing.  Defendants H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons's challenged misconduct at the heart of this case is not subject to the protections of the business judgment rule because these individuals put the interests of an outside third party

over that of their own Company.  Moreover, the Director Defendants, comprising the entire current Board, continuously deferred to the judgment of conflicted management and therefore has no basis to hide behind the business judgment rule.

**Demand Is Excused Because a Majority of the Board Lacks the Independence Necessary to Prosecute Suit**

90.     A majority of the Board is not independent because Board members are beholden to defendant H. Simmons, who controls and serves on the Board.  As a result, not surprisingly, the Board has exhibited a pattern and practice of deferring to H. Simmons and acting for the benefit of H. Simmons rather than TIMET's public shareholders.

91.     Of the seven current directors, two are not independent as they are defendant H. Simmons, the main culprit and beneficiary of the wrongdoing alleged herein, and defendant G. Simmons, his brother.  In addition to the family connection, G. Simmons has been an officer or director of H. Simmons-controlled companies since 1969, specifically: (i) he has been the Vice Chairman of Valhi and defendant Contran since 1987; (ii) he is a director of NL and Kronos; and (iii) he is the Chairman of Keystone and CompX.  In 2010, G. Simmons was paid more than $450,000 for his positions with Kronos, Valhi, CompX, and NL, compared to the $38,000 he was paid by TIMET.  G. Simmons is hopelessly conflicted by the much greater compensation he is paid by the companies with which TIMET is forced to engage in unfair transactions and by his close familial relationship with his brother, H. Simmons.  G. Simmons is therefore unable to appropriately consider a demand on the TIMET Board.

92.     Defendant Watson, who is also TIMET's CEO, is not independent of the Company's controlling shareholder defendant H. Simmons, as he owes his livelihood to companies controlled by H. Simmons.  Watson has been an employee of H. Simmons-controlled companies since 1980, and has been a TIMET director since 2000.  Over the past three years,

Watson has received nearly $3 million in income from the Company.  He has also earned almost $6 million from Valhi, NL, Kronos, and CompX - all entities controlled by H. Simmons - in the last three years.  By any measure, Watson cannot be considered independent of the influence of H. Simmons.  Moreover, given that the majority of Watson's income comes from the companies with which TIMET has been forced to engage with in transactions unfair to TIMET, Watson is hopelessly conflicted and cannot properly consider a demand on the TIMET Board.

93.     Defendants Coogan, Worrell, and Stafford are on the Boards of other defendant H. Simmons-controlled companies, in addition to TIMET.  Since H. Simmons controls all of these companies and determines who serves on these Boards, Coogan, Worrell, and Stafford all owe their positions and the director remuneration they receive from TIMET, Kronos, CompX, and NL to H. Simmons.  Consequently, Coogan, Worrell, and Stafford do not have the adequate independence to prosecute a suit for the wrongdoing alleged herein.

94.     In addition to the foregoing conflicts and disabling interests, the Delaware Court of Chancery has in the past found that there was reasonable doubt as to defendant Stafford's independence from defendant H. Simmons.  In the *Kahn* v. *Tremont Corp.* matter,[2] the court noted Stafford's financial ties to H. Simmons-controlled entities (specifically, NL) and his affiliation with H. Simmons created a reasonable doubt about Stafford's ability to act independently of H. Simmons.

95.     For all the foregoing reasons, a majority of the TIMET Board suffers from conflicts of interest and/or is beholden to or dominated by defendant H. Simmons.  Demand is therefore excused.

---

[2] *Kahn* v. *Tremont Corp.*, C.A. No. 12339, 1994 WL 162613, at *4 (Del. Ch. Apr. 21, 1994).

96.     Defendant H. Simmons's domination over the Board is also evident by the way he is allowed to run the Company.  As described above, the Board has allowed the Company to engage in at least seven related-party transactions in the past three to four years that run to the benefit of H. Simmons, sometimes without approval of the "independent" directors and even without requiring any vote on the matter.  Each of the transactions at issue in this Complaint involve transactions in which H. Simmons stands on both sides as the controlling shareholder:

      (a)      The below-market-rate loan to defendant Contran;

      (b)      The below-market-rate loan facility to Contran;

      (c)      The below-market-rate loan to CompX;

      (d)      The combined risk management program;

      (e)      Utility services arrangement;

      (f)      Data recovery arrangement; and

      (g)      The Company's purchase of Valhi stock.

**Demand Is Excused Because Defendants H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons Face a Substantial Likelihood of Liability for Their Misconduct**

97.     Defendants H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons owe TIMET the fiduciary duties of care and loyalty.  In order to meet their fiduciary duties, these directors are obligated to oversee the business of TIMET so that it is always conducted in TIMET's best interest.  This duty requires the directors to have in place internal controls sufficient to detect transactions that are not in TIMET's best interest and to prevent them from happening.

98.     Defendant H. Simmons faces a substantial likelihood of liability for being the ringleader and main beneficiary of the widespread self-dealing alleged herein.  Accordingly, H. Simmons is incapable of impartially considering a demand to commence and vigorously

prosecute this action because he has an interest in maintaining his control of the Company and the benefits he has achieved through improperly exercising this control.

99.     As alleged above, defendants H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons (*comprising the entire Board*) face a substantial likelihood of liability for failing to ensure that TIMET had sufficient internal controls to prevent unfair related-party transactions such as: (i) the below market rate loan facility to defendant Contran; (ii) the September 2009 amendment to the below market rate loan to CompX; (iii) the combined risk management program; (iv) the utility services arrangement; (v) the data recovery program; and (vi) TIMET's purchases of Valhi stock. None of these transactions was in the best interest of TIMET, but rather served the interests of H. Simmons and his affiliated entities.  Each of the current directors breached their duty of loyalty by approving these self-dealing transactions.

100.     Here, the Board had direct knowledge of several transactions (examples of which are enumerated above) in which TIMET's interests were sacrificed for the interests of other defendant H. Simmons-affiliated entities.  Despite that knowledge, the Board took no action to address the harm caused by those transactions or to put in place sufficient internal controls to stop such transactions from happening in the first place.

101.     Defendants H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons, once again comprising the entire current Board, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in the Company's Proxy Statements between 2009 and 2011.  Thus, the current Board faces a substantial likelihood of liability for their violation of the federal securities laws.

102.     Due to these failures by defendants H. Simmons, Watson, Zucconi, Coogan, Stafford, Worrell, and G. Simmons, the entire Board faces a substantial likelihood of liability.

As such, the Board is interested in the transactions challenged herein, and cannot appropriately consider a demand.

103.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by TIMET's officers and directors and these acts are incapable of ratification.

104.    Each of the defendant directors of TIMET authorized and/or permitted the improper statements disseminated directly to the Company's shareholders and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

105.    TIMET has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for TIMET any part of the damages TIMET suffered and will suffer thereby.

106.    If TIMET's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of TIMET. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by TIMET against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause TIMET to sue themselves or certain of the officers of TIMET, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this

action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors and officers' liability insurance, then the current directors will not cause TIMET to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

107.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for TIMET for any of the wrongdoing alleged by plaintiff herein.

108.    Plaintiff has not made any demand on the other shareholders of TIMET to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    TIMET is a publicly held company with over 175 million shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Director Defendants for Violation of Section 14(a) of the Exchange Act

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.    The Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in the Company's Proxy Statements between 2009 and 2011.  The Proxy Statements contained

proposals to TIMET's shareholders that they vote to re-elect the Directors Defendants to hold office.

111.    The Proxy Statements, however, misrepresented and failed to disclose material information, including the extent of self-dealing by defendant H. Simmons and the Board's approval and/or acquiescence of the self-dealing.  By reasons of the conduct alleged herein, the Director Defendants, violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, TIMET misled and/or deceived its shareholders by falsely portraying the qualifications, integrity, and true loyalties of the Director Defendants.  Had shareholders been provided with complete and accurate information concerning the Board's performance of its duties including with respect to presiding over H. Simmons's extensive self-dealing - the members of the Board would not have been re-elected.

112.    Plaintiff, on behalf of TIMET, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of the Director Defendants based upon the misleading and incomplete proxy materials.  Plaintiff, on behalf of TIMET, also seeks to void the election of the Director Defendants.

## COUNT II

### Against the Director Defendants For Violation of Section 20(a) of the Exchange Act

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    The Director Defendants acted as controlling persons of TIMET within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of TIMET, and participation and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statements filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly,

the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

115.    Each of the Director Defendants was provided with or had unlimited access to copies of the Proxy Statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

116.    In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

117.    In addition, as the Proxy Statements sets forth at length, and as described herein, the Director Defendants were each involved in approving and/or acquiescing to the improper related-party transactions at issue in this Complaint.  The Proxy Statements purport to describe the various concerns and information that the Director Defendants reviewed and considered in approving the related-party transactions, descriptions of which had input from the entire Board.

118.    By virtue of the foregoing, the Director Defendants have violated section 20(a) of the Exchange Act.

119.    As set forth above, the Director Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) of the Exchange Act by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, TIMET will be irreparably harmed.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    The Individual Defendants, as directors of TIMET, are fiduciaries of the Company and its shareholders. As such, they owe the Company the highest duties of loyalty, candor, and good faith and fair dealing.

122.    The Individual Defendants breached their fiduciary duties by failing to fairly evaluate the related-party transactions described herein, by approving and permitting such transactions to go forward on terms unfavorable to the Company and its shareholders, by failing to put in place sufficient internal controls to stop such related-party transactions from going forward on terms unfavorable to the Company and its shareholders, and by elevating the interests of defendant H. Simmons and his affiliated entities over the interests of TIMET.

123.    Defendant H. Simmons, as a controlling shareholder, breached his fiduciary duties by using his control over TIMET and the Individual Defendants to cause the Company to engage in related-party transactions to his benefit, despite knowing that such transactions would ultimately be detrimental to the Company.

124.    In contemplating, planning, and/or effecting the foregoing conduct, the Individual Defendants were not acting in good faith toward the Company and breached their fiduciary duties.

125.    As a result of these actions of the Individual Defendants, the Company has been and will be damaged.

## COUNT IV

### Against Defendant Contran for Aiding and Abetting Breaches of Fiduciary Duties

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    Defendant Contran aided and abetted the Individual Defendants in breaching their fiduciary duties owed to the Company.

128.    The Individual Defendants owed the Company certain fiduciary duties as fully set out herein.

129.    By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to the Company.

130.    Defendant Contran colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to the Company.

131.    Defendant Contran participated in the breaches of the fiduciary duties by the Individual Defendants for the purpose of advancing its own interests.  Contran obtained and will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches.

132.    The Company shall be irreparably injured as a direct and proximate result of the aforementioned acts.

### COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    As a result of the wrongdoing discussed above, the Individual Defendants have caused TIMET to waste its assets by:

(a)    providing the: (i) below market rate loan to defendant Contran; (ii) below market rate loan facility to Contran; and (iii) below market rate loan to CompX;

(b)    purchasing: (i) utility services from BMI; (ii) data recovery services from defendant Contran on unfavorable terms; (iii) Valhi shares; and (iv) insurance and risk management services from Tall Pines and EWI; and

(c)     paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

135.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

136.    Plaintiff, on behalf of TIMET, has no adequate remedy at law.

## COUNT VI

## Against the Individual Defendants for Unjust Enrichment

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of TIMET.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to TIMET.

139.    Defendant H. Simmons received the largest windfall from the wrongdoing as he was the ringleader in causing TIMET to engage in a number of transactions benefitting himself and sister entities controlled by him, to the detriment of TIMET.

140.    Plaintiff, as a shareholder and representative of TIMET, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

141.    Plaintiff, on behalf of TIMET, has no adequate remedy at law.

## COUNT VII

### Against Defendant Contran for Unjust Enrichment

142.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.    By its wrongful acts and omissions, Contran was unjustly enriched at the expense of and to the detriment of TIMET.  Contran was unjustly enriched as a result of its participation in the self-dealing transactions alleged herein.

144.    Contran was advantaged by the wrongdoing as it was the direct and/or parent company benefiting from the improper related-party transactions addressed in this Complaint.

145.    Plaintiff, as a shareholder and representative of TIMET, seeks restitution from Contran, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Contran, from its wrongful conduct.

146.    Plaintiff, on behalf of TIMET, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of TIMET, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Declaring and decreeing that the Director Defendants acted in violation of sections 14(a) and 20(a) of the Exchange Act;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect TIMET and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the

Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's controls over self-dealing through the creation of an independent committee tasked with the responsibility of supervising and approving related-party transactions;

2.      a provision to permit the shareholders of TIMET to nominate at least three candidates for election to the Board; and

3.      a proposal to strengthen TIMET's oversight of its disclosure procedures;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' wrongdoing so as to assure that plaintiff on behalf of TIMET has an effective remedy;

E.      Awarding to TIMET restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: December 30, 2011                    KENDALL LAW GROUP, LLP


                                            /s/ Joe Kendall
                                            JOE KENDALL
                                            State Bar No. 11260700
                                            JAMIE J. MCKEY
                                            State Bar No. 24045262

3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone: (214) 744-3000
Facsimile:  (214) 744-3015
E-Mail:  jkendall@kendalllawgroup.com
          jmckey@kendalllawgroup.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
E-Mail:  brobbins@robbinsumeda.com
          farroyo@robbinsumeda.com

Attorneys for Plaintiff

684861